#26389-rev & rem-LSW

**2013 S.D. 24**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JAMES R. GEIER,                          Plaintiff and Appellee,

    v.

JANET M. GEIER,                          Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
ROBERTS COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JON S. FLEMMER
Judge

* * * *

NANCY L. OVIATT of
Green, Roby, Oviatt,
  Cummings & Linngren, LLP
Watertown, South Dakota                  Attorneys for plaintiff
                                         and appellee.


ROGER W. ELLYSON
Watertown, South Dakota                  Attorney for defendant
                                         and appellant.

* * * *

CONSIDERED ON BRIEFS
ON FEBRUARY 12, 2013

OPINION FILED **03/20/13**

WILBUR, Justice

[¶1.] Janet Geier appeals from the trial court's denial of her motion to set aside a judgment. We reverse and remand.

## FACTS AND PROCEDURAL HISTORY

[¶2.] Janet and James Geier were married on February 15, 1997. At the time of the hearing, James was 61 and Janet was 54. During their marriage, Janet and James worked at a hospital in Milbank, South Dakota, as registered nurses. They did not have any children together.

[¶3.] Janet was diagnosed with relapsing-remitting multiple sclerosis in 1992. James was aware of Janet's diagnosis at the time of their marriage. She also has a history of dementia, cognitive deficits, anxiety, and depression. She has been prescribed medication to deal with several of these infirmities. In December 2002, she was declared disabled and began to receive disability benefits in July 2003.

[¶4.] James testified that Janet had good days and bad days. On her bad days, she would require assistance getting out of bed, to the restroom, and around the house. He further stated that the multiple sclerosis would affect her strength and, on occasion, her vision and speech. Even though Janet had more good days than bad days, James testified that he worried about her ability to remain safely at home. On December 4, 2010, Janet fell and broke her tailbone, requiring hospitalization.

[¶5.] In February 2011, James contacted attorney, Craig Ash, about starting a divorce action. James admitted that the stated purpose of the divorce was to help Janet qualify for Medicaid and to protect his assets from depletion if Janet were to

require nursing home care. On February 16, 2011, James presented Janet with the admission of service, which she signed. Upon seeing her emotional state, James asked Janet if she wanted him to call her sister, Rebecca Woodard. Janet indicated that she did and James called Woodard and informed her that he had started the divorce proceedings. In the days following the commencement of the divorce, James testified that the parties discussed the divorce nearly every day and he told Janet that, married or not, she could live at their house as long as her health permitted.

[¶6.]      Janet fell at home and broke her hip on March 24, 2011, requiring another lengthy hospitalization. James testified that he called Attorney Ash and informed Attorney Ash that he was going to wait to proceed with the divorce until James could see how Janet recovered. James further testified that he "told [Janet] if she could show [him] that . . . she could be safe at home and start eating better and regain her strength that [he] would hold off on the divorce proceedings." Woodard testified that, not long after she had heard from James that he had commenced the divorce, Janet had told her that the divorce had been called off.

[¶7.]      At the end of July 2011, James contacted Attorney Ash to have him prepare the marital termination agreement (the agreement) and affidavits. On August 16, 2011, Janet was unresponsive and was taken by ambulance to the hospital. She was diagnosed with a urinary tract infection. Janet made a relatively quick recovery from the infection. Following her hospitalization, James, on his own accord, took over management of Janet's medications. James testified that after August 16, Janet did not have any more flare-ups and was quite functional and conversant.

[¶8.]     Attorney Ash proceeded to prepare the agreement and affidavits and James picked up the documents on August 31, 2011. James testified that he presented the documents to Janet and reviewed them with her nearly every day.

[¶9.]     On September 6, 2011, James testified that Janet got out of bed by herself, took care of all of her own personal needs, ate breakfast, walked to the car with assistance, and used a wheelchair to move from the car to Attorney Ash's office. While at Attorney Ash's office, Attorney Ash testified that Janet seemed alert and responded appropriately. He also stated that Janet "appeared . . . she understood why she was there from how she responded." Attorney Ash further testified that he advised Janet that he was not her attorney and that she may have an attorney if she wanted. Attorney Ash then proceeded to go through each paragraph of the agreement. Attorney Ash testified that he explained to Janet that, if she signed the agreement, Janet would be waiving alimony. Janet signed the agreement at the meeting, which lasted 40 minutes.

[¶10.]    In her affidavit to the trial court, Janet disputed this testimony. When James presented the agreement to Janet, Janet stated that she only had 10 minutes to review it. Janet also asserted that James never told her that she should hire her own lawyer or that he would pay for it. Because of her deteriorated condition in September 2011, Janet stated that she does not remember meeting Attorney Ash or signing the agreement.

[¶11.]    The agreement gave James the marital home, a 2004 pickup, a 2011 car, a boat and trailer, a utility trailer, his retirement accounts, stocks, bonds, checking and savings accounts, and life insurance. The values as to these

properties were not given in the agreement. The agreement also provided that each party is capable of supporting themselves and waived any claim to alimony. In addition, the agreement erroneously contained a provision for child support and the notary provision involving Janet's signature stated that the agreement was signed on September 6, 2007. The judgment and decree of divorce were filed on September 12, 2011.

[¶12.]    On September 27, 2011, because they were no longer married and Janet was no longer on his health insurance, James arranged for an insurance agent to come to his house.[1] Janet engaged in conversation with the agent and purchased a Medicare supplement insurance policy. The next day, Janet could not get out of bed and was confused. James took Janet to the hospital where the medical staff noted Janet's progressive weakness and significant weight loss. The parties dispute whether James told the hospital staff that Janet would not be able to return home or whether the hospital staff told James that Janet was too ill to return home.[2] Woodard testified that James called to inform her that he and Janet were divorced and that Janet was ill and not permitted to return home.

[¶13.]    The next day, Woodard came to South Dakota and observed Janet's grave condition. Woodard contacted an attorney to meet with Janet at the hospital and steps were taken to have Woodard appointed as Janet's guardian. Woodard

---

1.    James allowed Janet to stay in the house after the divorce.

2.    A medical record dated September 28, 2011, contained within the exhibits admitted by the court, indicates that "[h]er ex-husband has divorced her and is apparently giving up her care to other family or long-term care facility as he is unable to keep her at home anymore."

signed a petition for appointment of guardian and conservator on October 3, 2011. On October 10, 2011, Janet was released from the hospital and transferred to a nursing facility in Watertown, South Dakota. Woodard was appointed Janet's guardian and conservator on November 1, 2011.

[¶14.] Following Woodard's appointment, Janet served James with interrogatories, a request for the production of documents, a motion to set aside judgment, Woodard's affidavit, and notice of hearing. James filed a motion for a protective order on January 23, 2012. Woodard filed the motion to set aside judgment and a motion to compel on January 24, 2012.

[¶15.] A hearing on those motions took place on February 2, 2012. The trial court determined that it would hear the motion to set aside judgment first. The trial court admitted two exhibits of medical records stating that "[o]bviously, what conclusions may be drawn from the records or what opinions may be offered about them will depend on witnesses who – who present testimony . . . ." Additionally, the trial court admitted an exhibit of Woodard's valuation of the couple's property. The court heard testimony from James, Attorney Ash, Bridget Johnson,[3] and Woodard. Janet did not attend the hearing.[4]

---

3. Johnson is a social worker at the hospital where Janet was hospitalized.

4. Janet contended that she was unable to attend the motion hearing because the courthouse in Roberts County did not have an elevator and her multiple sclerosis had bound her to a walker or a wheelchair. Janet's counsel conceded that he did not think it was necessary to have Janet attend the hearing. The court indicated that it would have accommodated Janet's needs had a request been made.

[¶16.] After both sides rested, the court announced its decision but was interrupted by Janet's counsel who asked for the opportunity to submit a written argument to the court in order to present statutes, cases, and testimony. The court permitted Janet's counsel to make a written argument, with James's counsel having the opportunity to respond, but warned that the court had made its decision. Janet submitted her brief to the court on February 8, 2012, and filed an affidavit on February 9, 2012. On April 23, 2012, the trial court filed a memorandum decision denying Janet's motion to set aside. In its memorandum decision, the court declined to consider Janet's affidavit because "[n]o permission was sought or received from the [c]ourt to submit such an [a]ffidavit after the parties had rested" and there was "no opportunity for James to cross-examine Janet about the contents of the [a]ffidavit or rebut [its] contents . . . ." Janet appeals the following issues:

1. Whether the trial court abused its discretion in denying Janet's motion to set aside the judgment.

2. Whether the trial court erred in failing to require James to answer Janet's interrogatories.

3. Whether the trial court erred in failing to consider Janet's affidavit.

## ANALYSIS AND DECISION

[¶17.] Janet contends that the trial court abused its discretion when it denied her motion to set aside the judgment. Janet argues that because of her infirmities and the circumstances surrounding the execution of the agreement, she did not know the consequences of what she was doing. Specifically, Janet points to a number of circumstances in support of her argument: her poor physical and mental health; her complete reliance on James; the fact that James's counsel prepared the

agreement; her lack of legal representation at the signing of the agreement; the fact that no family member or friend representing Janet's interests was notified or had the opportunity to review the agreement prior to Janet's signature; the errors contained within the agreement itself; the fact that Janet signed the agreement in front of James's attorney and James at the attorney's office; and the terms of the agreement were adverse to Janet's interests. Janet further asserts that she established a meritorious defense in that she would receive a more favorable property settlement if the judgment were set aside.

[¶18.] "The decision to grant or deny a motion under SDCL 15-6-60(b) rests with the sound discretion of the trial court and will not be disturbed on appeal unless there has been an abuse of discretion." *Lowe v. Schwartz*, 2006 S.D. 48, ¶ 8, 716 N.W.2d 777, 779 (quoting *Walsh v. Larsen*, 2005 S.D. 104, ¶ 6, 705 N.W.2d 638, 641). SDCL 15-6-60(b) provides:

> On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:
> (1) Mistake, inadvertence, surprise, or excusable neglect;
> (2) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under § 15-6-59(b);
> (3) Fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;
> (4) The judgment is void;
> (5) The judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or
> (6) Any other reason justifying relief from the operation of the judgment.
> The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the

> judgment, order or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. Section 15-6-60 does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided by statute or to set aside a judgment for fraud upon the court.

SDCL 15-6-60(b) "is not a substitute for an appeal. It does not allow relitigation of issues that have been resolved by the judgment. Instead it refers to some change in conditions that make continued enforcement inequitable." *Lowe*, 2006 S.D. 48, ¶ 10, 716 N.W.2d at 779 (quoting *Sjomeling v. Stuber*, 2000 S.D. 103, ¶ 14, 615 N.W.2d 613, 616). "The intent of this rule is to 'preserve the delicate balance between the sanctity of final judgments and the incessant command of a court's conscience that justice be done *in light of all the facts.*'" *Id.* ¶ 11 (quoting *Action Carrier, Inc. v. United Nat'l Ins. Co.*, 2005 S.D. 57, ¶ 14, 697 N.W.2d 387, 391). "The trial court should exercise its discretion liberally in accordance with legal and equitable principles so as to promote the ends of justice." *Id.* (quoting *Elliott v. Cartwright*, 1998 S.D. 53, ¶ 7, 580 N.W.2d 603, 604). Furthermore, "there is much more reason for liberality in reopening a judgment when the merits of the case never have been considered than there is when the judgment comes after a full trial on the merits." *Id.* ¶ 12 (quoting *MIF Realty L.P. v. Rochester Assocs.*, 92 F.3d 752, 756 (8th Cir. 1996)).

[¶19.]     A party seeking relief from a final judgment under SDCL 15-6-60(b)(1) must show: "(1) exceptional circumstances constituting excusable neglect (or other statutory grounds); and (2) a probable meritorious defense." *Crothers v. Crothers*, 2001 S.D. 78, ¶ 15, 630 N.W.2d 103, 107. "Excusable neglect must be neglect of a

nature that would cause a reasonable, prudent person to act similarly under similar circumstances." *Clarke v. Clarke*, 423 N.W.2d 818, 821 (S.D. 1988). "'[E]xcusable neglect' has no fixed meaning and is to be interpreted liberally to insure that cases are heard and tried on the merits." *Id.*

[¶20.]		The trial court abused its discretion in denying Janet's motion to set aside. In making its determination on Janet's motion to set aside, the trial court stated in its memorandum decision:

> However, in this case, the [c]ourt did not make a division of property; the [c]ourt simply approved an [a]greement between the parties. The issue then is more complicated than simply one of whether the [a]greement favors one party more than the other; the issue is whether the written document was entered into voluntarily and reflects the actual [a]greement of the parties.

Whether the agreement "was entered into voluntarily" is not the standard by which we determine whether or not to set aside a judgment. Instead, we have consistently stated that in order to set aside a judgment under SDCL 15-6-60(b) a party must demonstrate exceptional circumstances constituting one of the statutory grounds and a probable meritorious defense. *Crothers*, 2001 S.D. 78, ¶ 15, 630 N.W.2d at 107.

[¶21.]		Here, the record demonstrates the presence of exceptional circumstances constituting excusable neglect. It is apparent from testimony and medical records admitted at the hearing that Janet's physical and mental infirmities have affected and continue to affect her everyday living. Janet was declared disabled in 2002. She was hospitalized for breaking her tailbone in 2010 and her hip in 2011. Additionally, the record demonstrates that Janet has "onset of

dementia," a history of cognitive deficits, anxiety, depression, and a seizure disorder. And, she was taking a number of prescription medications for these infirmities. Further, as of August 2011, Janet was completely dependent on James for her care and transportation.

[¶22.] While not a determinative factor by itself, it is also important to note that Janet was unrepresented by counsel throughout the negotiations and the execution of the agreement. James provided Attorney Ash with the terms of the agreement. And, no one other than Attorney Ash and James spoke with Janet about the terms of the agreement before she signed it.[5]

[¶23.] In order to prevail, Janet must also show a probable meritorious defense to successfully obtain relief from the judgment. "The party seeking relief must present facts either by answer or affidavit from which it could be inferred that upon a trial he would be entitled to a judgment more favorable to himself than the judgment from which he is seeking relief." *Frieberg v. Frieberg*, 509 N.W.2d 415, 419 (S.D. 1993) (quoting *Clarke*, 423 N.W.2d at 821). "An applicant for relief from a judgment satisfies the meritorious defense requirement, however, if he makes only a prima facie showing." *Id.* "The rule does not intend that there should be two trials on the merits." *Id.* (quoting *Nat'l Sur. Corp. v. Shoemaker*, 86 S.D. 302, 310, 195 N.W.2d 134, 138–39 (1972)).

[¶24.] Here, Janet has demonstrated a probable meritorious defense in that she would receive a more favorable property settlement if the judgment were set

---

5. In her affidavit, Janet stated that, because of her deteriorated health, she did not recall meeting Attorney Ash or signing the agreement.

aside. The agreement provided for a grossly disproportionate division of property that left Janet, who is disabled and unable to earn an income, with very little marital property to support herself. The agreement did not place valuations on the property. After filing her motion to set aside, Janet served interrogatories on James, which sought to establish the value of the martial property. James subsequently filed a protective order. In response, Janet filed a motion to compel. These motions went unaddressed at the hearing. Thus, we are left with Woodard's valuation of the marital property in determining the proportionality of the division of such property as contemplated in the agreement.

[¶25.]    The agreement gave James the marital home, two vehicles, a boat and trailer, a utility trailer, his retirement accounts, stocks, bonds, checking and savings accounts, and life insurance worth approximately $232,500 (92 percent) of the property. Janet, however, only received approximately $20,149 (8 percent) of the property and she waived alimony. These valuations may very well be below the value of all of the property making the division of the property in the agreement even more disproportionate. The valuations may also be above the value of all of the property. It is not clear from this record and "justice [must] be done in light of all of the facts." *Lowe,* 2006 S.D. 48, ¶ 11, 716 N.W.2d at 779 (quoting *Action Carrier, Inc.,* 2005 S.D. 57, ¶ 14, 697 N.W.2d at 391). In order for justice to be done, a trial on the merits, after appropriate discovery, is necessary. Therefore, Janet has demonstrated exceptional circumstances constituting excusable neglect and a probable meritorious defense mandating relief from the final judgment. Because of our holding on this issue, we need not address the remaining issues.

**CONCLUSION**

[¶26.] The trial court abused its discretion in denying Janet's motion to set aside. Janet has demonstrated exceptional circumstances constituting excusable neglect and a probable meritorious defense. Therefore, we reverse and remand to the trial court for a trial on the merits.

[¶27.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and SEVERSON, Justices, concur.